# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHIL CAMPBELL,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NANCY A. BERRYHILL[1],<br>Acting Commissioner of Social Security,<br><br>　　　　Defendant. | Case No.: 1:15-cv-01761 - JLT<br><br>ORDER REMANDING THE ACTION PURSUANT TO SENTENCE FOUR OF 42 U.S.C. § 405(g)<br><br>ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF PHIL CAMPBELL AND AGAINST DEFENDANT NANCY BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY |

Phil Campbell asserts he is entitled to supplemental security income under Title XVI of the Social Security Act. Plaintiff asserts the administrative law judge ("ALJ") erred in finding his subjective complaints lacked credibility and in evaluating the opinion of his treating physician. Because the ALJ failed to apply the proper legal standards, as discussed below, the administrative decision is **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## **PROCEDURAL HISTORY**

In his application for benefits, Plaintiff asserted that he became disabled as of November 20, 2011. (Doc. 14-6 at 2) The Social Security Administration denied Plaintiff's application at both the initial level and upon reconsideration. (*See generally* Doc. 14-4; Doc. 14-3 at 32) After requesting a hearing, Plaintiff testified before an ALJ on April 8, 2014. (Doc. 14-3 at 32, 48) The ALJ determined

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant.

1

Plaintiff was not disabled and issued an order denying benefits on May 2, 2014. (*Id.* at 32-41) When the Appeals Council denied Plaintiff's request for review of the decision on September 18, 2015 (*id.* at 2-3), the ALJ's findings became the final decision of the Commissioner of Social Security ("Commissioner").

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability,

the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## **ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

### A.  **Relevant Medical Opinions**

On November 20, 2011, Plaintiff was picked up by emergency medical services, after reporting "he had been walking when he fell." (Doc. 14-8 at 4) Plaintiff was transported to a hospital where he "was considered drunk," because his blood alcohol level was measured at 0.43. (*Id.* at 2, 4) However, Plaintiff's "level of consciousness decreased" and he "was near comatose." (*Id.* at 2, 49) A CT scan "revealed evidence of an extremely large subdural hematoma" on the right side of his brain, and Plaintiff was transferred to Doctors Medical Center for an emergency right frontotemporoparietal craniotomy. (*Id.* at 2)

After the surgery, Plaintiff was placed "in the neuro critical care unit." (Doc. 14-8 at 2) He demonstrated "[m]arked confusion, agitation and obvious cognitive impairment." (*Id.*) Dr. Gregory Helbig noted that Plaintiff "slowly improved," and "was transferred to the neuro step-down unit." (*Id.*) Dr. Helbig believed Plaintiff was "likely going through an alcohol withdrawal and [had] marked hypertension." (*Id.*) As part of his recovery treatment, Plaintiff "was seen by speech therapy with evidence of cognitive problems and probably some preexisting." (*Id.*) Once Plaintiff reached the "maximum hospital benefit" and could "perform activities of daily living in general," he was discharged on December 12, 2011. (*Id.* at 3)

Plaintiff had a follow-up visit with Dr. Helbig on March 6, 2012. (Doc. 14-8 at 49) Plaintiff

"complain[ed] of some occasional confusion," which Dr. Helbig believed "may be residual post-concussive injury to the brain" that could "take a year or two for [Plaintiff] to fully recover." (*Id.*) He found Plaintiff was alert and oriented, had Plaintiff's speech was "clear and fluent." (*Id.*) Dr. Helbig observed that Plaintiff had "some mild gait staggering." (*Id.*)

In April 2012, Plaintiff sought to establish care at Tuolumne Health and Wellness Center. (Doc. 14- at 61) Dr. Eric Runte noted observed that Plaintiff had recovered from his injury and was "relatively stable." (*Id.*) In addition, Dr. Runte noted Plaintiff had "multiple medical problems including obesity, hypertension, alcoholism, rosacea, and eczema." (*Id.*) Plaintiff described symptoms including depression, "forgetfulness, loss of sleep, nervousness, fatigue, headaches…, dizziness, [and] seizures." (*Id.*)

Dr. Gerardine Gauch performed a comprehensive psychiatric evaluation on May 6, 2012. (Doc. 14-8 at 66) She noted Plaintiff "endorsed symptoms of memory loss, head pain, and confusion." (*Id.*) Plaintiff told Dr. Gauch that he was "dizzy, disoriented, sleepy, incoherent at times, and in general 'not the same guy'" since his injury. (*Id.* at 67) Plaintiff stated he was "not a big drinker but reported drinking 2-8 drinks daily." (*Id.*) She tested Plaintiff's memory, and found "[h]e was able to recall 3/3 items immediately and 1/3 items spontaneously after several minutes and a second time after several minutes when offered a clue." (*Id.* at 69) Dr. Gauch found Plaintiff "was able to perform a simple three-step command successfully," and opined that his "concentration ability was within normal limits." (*Id.*) She diagnosed Plaintiff with: "Cognitive disorder, not otherwise specified, secondary to closed head injury" and "Adjustment disorder with depressed mood." (*Id.* at 70) Dr. Gauch noted:

> Although the claimant appeared to respond to questions in an open and honest manner and appeared to give his best effort to the Mental Status Examination, the claimant repeatedly made statements during the evaluation that he is very depressed and he is crazy. In comparison to available records, the claimant minimized the influence of alcohol in the accident that caused his head injury. The claimant demonstrated mild disinhibition and appeared to be invested in being seen as crazy and in this way toyed with faking bad during this evaluation.

(*Id.* at 70) Dr. Gauch concluded Plaintiff had a "fair" ability to understand and remember short and simple instructions, complete a workday and workweek, deal with work changes, and interact with coworkers." (*Id.* at 71) Further, Dr. Gauch opined that Plaintiff's "ability to maintain attention and concentration" and sustain an ordinary routine was "good." (*Id.*)

4

Plaintiff had CT scan without contrast on May 11, 2012. (Doc. 14-8 at 74) Dr. G. Schaner determined Plaintiff had "[s]mall subacute to chronic subdural hemorrhages" and "some calcification to the medial margin of the subdural collection consistent with more acute component." (*Id.*)

Dr. Fariba Vesali conducted a comprehensive neurological evaluation on June 1, 2012. (Doc. 14-8 at 75) Dr. Vesali noted that Plaintiff reported he had "dizzy spells and [could not] concentrate" after his subdural hematoma and surgery. (*Id.*) She noted Plaintiff was able to "answer[] questions and follow[] three-step commands with no difficulties." (*Id.* at 76) In addition, Plaintiff did not "have any difficulty getting on or off the examination table," taking off his shoes, putting on his shoes, or tying them. (*Id.*) Dr. Vesali concluded Plaintiff would be able to stand, walk, and sit "with no limitations;" "lift/carry 50 pounds occasionally and 25 pounds frequently;" and did not need an assistive device for ambulation. (*Id.* at 78) Dr. Vesali opined Plaintiff's "conditions [would] impose limitations for 12 continuous months due to his history of subdural hematoma." (*Id.* at 77)

On June 19, 2012, Dr. James Wakefield performed "a psychodiagnostic evaluation" and administered the Wechsler Adult Intelligence Scale ("WAIS")- Fourth Edition, Wechsler Memory Scale, Trials A & B, and Bender- Gestalt II tests. (Doc. 14-8 at 80-81) He found Plaintiff had "deficient" attention, concentration, and memory for verbal material. (*Id.* at 81) Dr. Wakefield observed that Plaintiff's "[i]ntelligence was presented as deficient, although his verbal interactions during [the] interview suggested stronger ability." (*Id.* at 82) Dr. Wakefield determined Plaintiff's full scale IQ with the WAIS-IV test was 67, and there was a "large" difference between the verbal and nonverbal ability. (*Id.*) He opined Plaintiff's "verbal memory is deficient, and his visual memory is deficient to borderline." (*Id.* at 84) Dr. Wakefield concluded:

> Phil's responses to the tests indicate that he can follow simple repetitive tasks, although more complex procedures and procedures making substantial demands on verbal ability would present difficulties. Phil is able to interact with co-workers, supervisors, and the public at a minimally acceptable level. He is able to sit, stand, walk, move, lift, carry, handle objects, hear, speak, and travel adequately. Phil's ability to reason and make occupational, personal, and social decisions in his best interests is limited. His social and behavioral functioning are appropriate. Phil's concentration and pace are weak. His persistence during the session was adequate.

(*Id.* at 84) Further, Dr. Wakefield opined Plaintiff should not be permitted to handle his own funds, given "[h]is history of alcohol abuse and his current denial." (*Id.*)

Dr. E. Aquino-Caro, an Agency physician, reviewed the record and completed a mental residual functional capacity assessment on July 2, 2012. (Doc. 14-4 at 10-13) Dr. Aquino-Caro opined Plaintiff had limitations with understanding and memory but believed he "[w]ould be able to understand and remember work locations and procedures of a simple routine nature involving 1-2 step tasks and instructions." (*Id.* at 11) Dr. Aquino-Caro also opined Plaintiff "[w]ould be able to maintain concentration and attention [for simple, routine tasks] in 2 hr increments." (*Id.* at 12) According to Dr. Aquino-Caro, Plaintiff had moderate limitations with interacting with the public, but could remain "socially appropriate with co-workers and the public without being distracted by them." (*Id.*) Dr. Aquino-Caro acknowledged her opinion was more restrictive than that of Dr. Vesali, and stated the assessment by the consultative examiner was "an overestimate of the severity of [Plaintiff's] restrictions/limitations and based only on a snapshot of … [his] functioning." (*Id.* at 13)

In September 2012, Plaintiff went to Sonora Regional Medical Center, complaining of pain in his right lower back. (Doc. 14-9 at 33) Plaintiff described the pain as "a 7/10 in severity," and said it radiated to his right hip and down his leg. (*Id.*) Dr. Greg Schaner found Plaintiff had a "decreased range of motion moving from sitting to supine position secondary to back pain," as well as "tenderness and muscle spasming in the right buttock and lower lumbar paraspinal muscles." (*Id.* at 34) He found Plaintiff had negative straight leg raising tests, and a full range of motion in the hip. (*Id*) Dr. Schaner also performed a neurological examination and opined that Plaintiff was "[a]lert and oriented," with normal speech, motor skills, and coordination. (*Id.*) Plaintiff was diagnosed with "lower back pain with sciatica," and received prescriptions for "nonsteroidal anti-inflammatories as well as Valium for muscle spasms." (*Id.* at 36)

Dr. A. Garcia, an Agency physician, reviewed the medical record in February 2013, and completed a mental residual functional capacity assessment. (Doc. 14-4 at 25-27) Dr. Garcia opined Plaintiff was "[n]ot significantly limited" with the ability to understand, remember, and carry out very short and simple instructions, but had moderate limitations with detailed instructions. (*Id.* at 25-26) According to Dr. Garcia, Plaintiff was "able to maintain concentration and attention" for tasks with short and simple instructions. (*Id.* at 46) Further, Dr. Garcia determined Plaintiff could "relate and accept directions from supervisors" and remain "socially appropriate with co-workers and the public

without being distracted by them." (*Id.*)

On October 14, 2013, Plaintiff was evaluated in the emergency department of Sonora Regional Medical Center for a head injury after a fall. (Doc. 14-9 at 3) Plaintiff had a "syncopal episode while he was drunk," and was witnessed falling by an individual at his halfway house. (*Id.* at 3-4) Although he was "amnestic to the event," Plaintiff reported he "took 5 shots" and suspected that caused him to fall. (*Id.* at 2) He broke his nose, which was corrected at the hospital. (*Id.* at 4) Plaintiff did not exhibit any neurological deficits and was discharged once he had improved and was no longer ataxic. (*Id.* at 3, 4)

Dr. Alexandra Campbell performed an intake assessment and mental status exam for Plaintiff on February 19, 2014. (Doc. 14-10 at 82-95) Plaintiff reported he did not have a drink for six months and was occasionally attending AA meetings. (*Id.* at 84, 88) He reported that for the past five years, he had "increasing [symptoms] of depression including sad mood, increasing social isolation and withdrawal, feelings of worthlessness and hopelessness, decreased energy, [and] anhedonia." (*Id.* at 82) Plaintiff also told Dr. Campbell that he had "difficulty sleeping due to constant worry about finances and … 'panic attacks' where he [felt] 'pressure in [his] chest,' with shallow breathing and feelings of doom." (*Id.*) Plaintiff said he had therapy sessions with Dr. Galyn Savage every three weeks, but he did not feel the appointments were frequent enough. (*Id.* at 83) He believed he was "unable to work due to [symptoms] of depression and anxiety." (*Id.* at 90) Dr. Campbell observed that Plaintiff was cooperative and pleasant, but he also appeared worried, ashamed, overwhelmed and dysphoric. (*Id.* at 92-93) She opined Plaintiff's thought process was logical, linear, and goal-directed. (*Id.* at 94) Dr. Campbell observed that while Plaintiff "stated that he has difficulty and concentrating and some difficulty [with] memory," he performed within normal limits on the mental status exam. (*Id.* at 94) Further, she concluded Plaintiff had fair immediate and recent memory, poor remote/ long term memory. (*Id.* at 95)

On March 12, 2014, Dr. John Glover performed a psychiatric evaluation. (Doc. 14-10 at 98) He noted that Plaintiff reported he had an "anxiety attack once a week, even while predictable." (*Id.*) In addition, Plaintiff told Dr. Glover that he first suffered depression when he was 17, and had a "prior [diagnosis] of bipolar 2 by his family doctor." (*Id.*) Plaintiff said he had mood swings "out of the

blue," decreased concentration and memory, and sometimes difficulty sleeping. (*Id.*) Dr. Glover observed that Plaintiff's thought process was intact, but his speech was pressured and his motor activity was agitated. (*Id.* at 99) Dr. Glover gave Plaintiff a GAF score of 45[2], and recommended he continue with individual therapy and group rehabilitation. (*Id.*)

Dr. Galyn Savage completed a psychiatric medical source statement on March 31, 2014. (Doc. 14-11 at 2) She noted that Plaintiff "[a]ppears/presents well but doesn't or can't follow through." (*Id.*) Dr. Savage opined Plaintiff had a "marked impairment" with his ability to understand, remember, and carry out "an extensive variety of technical and/or complex job instructions." (*Id.*) She believed Plaintiff was "able to understand but cannot carry out" simple one-or-two step instructions. (*Id.*) Also, Dr. Savage noted Plaintiff's ability to concentrate for at least two-hour increments "fluctuate[d] due to mood swings [and] anxiety." (*Id.*) Likewise, Dr. Savage believed Plaintiff's ability to deal with the public "fluctuate[d] from excellent to severely impaired." (*Id.*) She noted things "got[] progressively worse" for Plaintiff after he lost his job and suffered the head injury. (*Id.*) Dr. Savage concluded that Plaintiff's "functioning remain[ed] impaired since [he] has been sober." (*Id.*)

**B.     Administrative Hearing Testimony**

Plaintiff testified before the ALJ at a hearing on April 8, 2014. (Doc. 14-3 at 50) He reported that he had a high school education and attended two years of junior college but did not receive an associate's degree or certificate. (*Id.* at 51) Plaintiff said he last worked in 2011, and stopped working due to being laid off, after which he suffered the brain injury. (*Id.* at 52-53)

He testified that he also had high blood pressure, a history of alcohol abuse, and anxiety. (Doc. 14-3 at 54) Plaintiff said his anxiety caused him the most problems, and described it as "a lot of pressure on [his] chest area," and that he felt like he would die if he did not take medication. (*Id.*) Plaintiff said he began seeing Dr. Glover, a psychiatrist, who prescribed an antipsychotic medication. (*Id.* at 55) Plaintiff testified the medication helped "somewhat." (*Id.*) However, Plaintiff believed he could not work due to the anxiety, saying he awakened in the morning "just totally full of anxiety" and

---

[2] GAF scores range from 1-100, and in calculating a GAF score, the doctor considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 34 (4th ed.) ("DSM-IV). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairments in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

felt "pressure just thinking about … if [he] had to report somewhere." (*Id.* at 64)

Plaintiff reported he suffered from anxiety prior to his brain injury, but believed the injury "compounded the situation." (Doc. 14-3 at 65) He testified that following the injury, he had "[a] hard time focusing" and was forgetful. (*Id.* at 66) Plaintiff believed he would miss "two days a week at least" if he had a job due to these symptoms. (*Id.* at 67)

Plaintiff said he went to group therapy "[a]bout once a week," where he met with others who had anxiety, depression, and histories of alcohol abuse. (Doc. 14-3 at 56) Plaintiff testified he had been "[s]ober for the last eight months at least," because he had been living in halfway houses where no drugs or alcohol allowed. (*Id.* at 57-59) When questioned about the hospital records indicating he had been drinking and suffered a fall in October 2013, Plaintiff responded he only "[s]lightly" remembered the incident and that when he drinks, he blacks out. (*Id.* at 57-58)

## C.     The ALJ's Findings

Pursuant to the five-step process set forth by the Regulations, the ALJ determined Plaintiff did not engage in substantial gainful activity after the alleged onset date of December 16, 2011. (Doc. 14-3 at 34) At step two, the ALJ found Plaintiff's severe impairments included: obesity; head injury with subdural hematoma, status post-surgery; organic mental disorder; depressive disorder; and alcohol abuse, in current remission. (*Id.*) At step three, the ALJ determined Plaintiff did not have an impairment, or combination of impairments, that met or medically equaled a Listing. (*Id.*) Next, the ALJ determined:

> [T]he claimant has the Residual Functional Capacity (RFC) to perform medium work as defined in 20 CFR 416.967(c) except the claimant has the ability to sit, stand or walk 6 hours each during an 8-hour workday; and the ability to lift or carry up to 50 pounds occasionally and up to 25 pounds frequently. The claimant is limited to simple, as defined in the Dictionary of Occupational Titles (DOT) as SVP levels 1 and 2, routine, repetitive tasks with only occasional changes in the work setting. He is also limited to only occasional interaction with the general public, supervisors and coworkers.

(*Id.* at 35) With this residual functional capacity, the ALJ concluded Plaintiff was unable to perform his past relevant work as a sales manager or house manager. (*Id.* at 40) However, the ALJ found "there are jobs that exist in significant numbers" in the national economy that Plaintiff could perform, such as caretaker, industrial cleaner, and store laborer. (*Id.* at 41) Therefore, the ALJ found Plaintiff was not disabled as defined by the Social Security Act. (*Id.*)

## **DISCUSSION AND ANALYSIS**

Appealing the decision of the ALJ, Plaintiff contends the ALJ erred in evaluating the credibility of his subjective complaints and in evaluating the medical evidence. (Doc. 21 at 8-18) On the other hand, Defendant argues the ALJ's decision "is supported by substantial evidence and free of harmful legal error." (*See* Doc. 25 at 13)

**A.    Plaintiff's Credibility**

In assessing credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)). Where the objective medical evidence shows an underlying impairment, and there is no affirmative evidence of a claimant's malingering, an "adverse credibility finding must be based on clear and convincing reasons." *Id.* at 1036; *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).

Factors that may be considered by an ALJ in assessing a claimant's credibility include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (the ALJ may consider a claimant's reputation for truthfulness, inconsistencies between a claimant's testimony and conduct, and a claimant's daily activities when weighing the claimant's credibility).

The ALJ noted that Plaintiff "alleges disability due to a head injury and subsequent cognitive deficits." (Doc. 14-3 at 36) In addition, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(*Id.* at 36) The ALJ then summarized the medical record, beginning with Plaintiff's hospitalization for

the brain injury in November 2011. (*See id.* at 36-40)

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Commissioner of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, that while a claimant's "testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis").

Importantly, however, if an ALJ cites the medical evidence to support an credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996) (the ALJ has a burden to "identify what testimony is not credible and what evidence undermines the claimant's complaints"); *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible"). Nevertheless, the ALJ failed to identify any statements he believed were inconsistent with the medical record. Rather, the ALJ provided only a summary of the entirety of the medical record. (*See* Doc. 14-3 at 36-40)

As the Ninth Circuit explained, a "summarize[ing] the medical evidence supporting [the] RFC determination… is not the sort of explanation or the kind of 'specific reasons' [the Court] must have in order to … ensure that the claimant's testimony was not arbitrarily discredited." *See, e.g., Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). As a result, "the observations an ALJ makes as part of the summary of the medical record are not sufficient to establish clear and convincing reasons for rejecting a Plaintiff's credibility." *Argueta v. Colvin*, 2016 U.S. Dist. LEXIS 102007 at *44 (E.D. Cal. Aug. 3, 2016). Although Defendant identifies reasons for rejecting Plaintiff's credibility based

upon the ALJ's summary of the medical records (*see* Doc. 25 at 9-10), these reasons were not clearly identified by the ALJ to support the adverse credibility determination. The Court is "constrained to *review* the reasons the *ALJ* asserts." *Brown-Hunter*, 806 F.3d at 494 (emphasis in original) (quoting *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)). Because the ALJ offered no more than a summary of the medical evidence and did not identify inconsistencies with the record, the objective medical record fails to support the adverse credibility determination.

Consequently, Court finds the ALJ failed to properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. In addition, the ALJ's failure to specifically discuss and identify what portions of Plaintiff's testimony he found not credible constituted a failure to apply the correct legal standards in evaluating Plaintiff's credibility. As a result, the ALJ's rejection of Plaintiff's credibility is not properly supported.

**B.     Evaluation of the Medical Evidence**

Plaintiff contends that the ALJ also erred in giving little weight to the opinion of Dr. Savage, a treating physician, because he "failed to give legally sufficient reasons for rejecting the opinion." (Doc. 21 at 11, emphasis omitted) Defendant contends the ALJ gave the opinion the "appropriate weight" and set forth legally sufficient reasons for doing so. (Doc. 25 at 11)

In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither examine nor treat the claimant. *Lester*, 81 F.3d at 830. In general, the opinion of a treating physician is afforded the greatest weight but it is not binding on the ultimate issue of a disability. *Id.*; *see also* 20 C.F.R. § 404.1527(d)(2); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). Further, an examining physician's opinion is given more weight than the opinion of non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

A physician's opinion is not binding upon the ALJ, and may be discounted whether it contradicts the opinion of another physician. *Magallanes*, 881 F.2d at 751. An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only by identifying "clear and

convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ").

In this case, the ALJ indicated he gave "little weight" to the opinion of Dr. Savage because it was contradicted by other evidence in the record. (Doc. 14-3 at 40) Specifically, the ALJ stated:

> On March 13, 2014, Dr. Galyn Savage prepared a psychiatric Medical Source Statement (MSS) indicating marked to extreme impairment in his ability to do all job related activities [Exhibit 19F]. This opinion is given little weight as it is contrary to the evidence of record that shows improvement, not progressively worsening conditions as Dr. Savage alleges. Further, this opinion is contradicted by the opinions of Dr. Gauch, Dr. Wakefield, and the State Agency psychological consultants.

(Doc. 14-3 at 40) Plaintiff contends the ALJ erred by failing to identify the contradictions between the opinions offered by the physicians in the record. (Doc. 21 at 16-17)

The Ninth Circuit has determined inconsistency with the overall record constitutes a legitimate reason for discounting a physician's opinion. *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 602-03 (9th Cir. 1999). However, when an ALJ believes a physician's opinion is unsupported by the objective medical evidence, the ALJ has a burden to "set[] out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986). Thus, the "ALJ must do more than offer his conclusions." *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). The Ninth Circuit explained: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required." *Id.*, 849 F.2d at 421-22.

The ALJ failED to identify specific evidence in the record that is inconsistent with the findings of Dr. Savage. (*See* Doc. 14-3 at 21) Instead, he offered only his conclusion that the limitations she

13

assessed were contradicted by the assessments of Drs. Gauch and Wakefield, and the State Agency psychological consultants. Furthermore, the ALJ failed to identify any evidence supporting his conclusion that Plaintiff's symptoms were improving overtime, contrary to Dr. Savage's opinion that things got "progressively worse" for Plaintiff. (*See* Doc. 14-11 at 2; Doc. 14-3 at 21) Because the ALJ failed to identify and explain inconsistencies between the record and the conclusions offered by Dr. Savage, the ALJ fails to meet his burden to resolve the conflict. His conclusions, without more, do not support the decision to give less weight to the limitations imposed by Dr. Savage. *See Allen*, 749 F.2d at 579; *Embrey*, 849 F.2d at 421.

## C. Remand is Appropriate

The decision whether to remand a matter pursuant to sentence four of 42 U.S.C. § 405(g) or to order immediate payment of benefits is within the discretion of the district court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). Except in rare instances, when a court reverses an administrative agency determination, the proper course is to remand to the agency for additional investigation or explanation. *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) (citing *INS v. Ventura*, 537 U.S. 12, 16 (2002)). Generally, an award of benefits is directed when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996). In addition, an award of benefits is directed where no useful purpose would be served by further administrative proceedings, or where the record is fully developed. *Varney v. Sec'y of Health & Human Serv.*, 859 F.2d 1396, 1399 (9th Cir. 1988).

The Ninth Circuit explained that "where the ALJ improperly rejects the claimant's testimony regarding his limitations, and the claimant would be disabled if his testimony were credited," the testimony can be credited as true, and remand is not appropriate. *Lester*, 81 F.3d at 834. However, courts retain flexibility in crediting testimony as true, *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003), and a remand for further proceedings regarding the credibility of a claimant is an appropriate remedy. *See, e.g., Bunnell*, 947 F.2d at 348 (affirming the district court's order remanding for further proceedings where the ALJ failed to explain with sufficient specificity the basis for rejecting the

claimant's testimony); *Byrnes v. Shalala*, 60 F.3d 639, 642 (9th Cir. 1995) (remanding the case "for further proceedings evaluating the credibility of [the claimant's] subjective complaints . . ."). Further, the ALJ failed to identify specific and legitimate reasons for giving little weight to the opinion of Plaintiff's treating physician, and the limitations identified by Dr. Savage are intertwined with the evaluation of Plaintiff's mental residual functional capacity. Consequently, the matter should be remanded for the ALJ to re-evaluate Plaintiff's credibility and the medical evidence of record.

## **CONCLUSION AND ORDER**

The ALJ failed to properly set forth findings "sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds." *Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir. 2004); *see also Thomas*, 278 F.3d at 958. In addition, the ALJ erred in evaluating the medical evidence and in rejecting the mental limitations identified by Dr. Savage. Because the ALJ failed to apply the correct legal standards, the decision should not be upheld by the Court. *See Sanchez*, 812 F.2d at 510. Accordingly, the Court **ORDERS**:

1. The matter is **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this decision; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Plaintiff Phil Campbell and against Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated: **June 7, 2017**  /s/ Jennifer L. Thurston
UNITED STATES MAGISTRATE JUDGE